This morning we have a full courtroom. I think that the students from VMI here are filling up the courtroom. We welcome you. It's very I hope you hear something interesting. We'll have good counsel. We'll give you a good show. The first case we hear this morning is Rivas De Nolasco v. Bondi. And Mr. Kim will hear from you first. Ms. Kim. Good morning, Your Honor. Adju Kim for petitioners. May it please the Court. The issue before this Court is whether the Board erred in finding no past persecution or well-founded fear of future persecution on account of membership in particular social groups. We argue that it has and ask this Court to vacate its decision and remand this matter. The standard of review before this Court is de novo for legal issues and substantial evidence for factual issues. When as here the BIA affirms the IJ's decision with an opinion of its own, this Court reviews both decisions. Can you start addressing our jurisdiction? My concern here puts two cases together. I want you to help me understand why I should not do that or how I take it to mean that there are distinct orders going on, that the order of removal or deportation is a distinct order from various forms of relief from that order, like being capped, withholding, and maybe asylum. And so Nasrallah tells us that there are distinct orders that are at issue and we don't want to merge the order of removal with other orders. So I take the Supreme Court to have told us that. And then I then combine that with our decision in Martinez where we said there that a reinstated order of removal, I'm not sure why it matters it was reinstated, but an order of removal becomes final, quote, when an alien chooses not to contest it. And so what I'm trying to understand is why putting those two together don't tell us that there was an order of removal that was entered by the IJ that's distinct from asylum or any other type of relief and that the alien here chose not to contest it before the IJ and chose not to contest it to the BIA. And so that is to say that it was final when it was not contested, or I guess more technically under the dictionary section it was final 30 days after he chose or she chose not to appeal it to the BIA. Help me understand what I'm I believe it's pretty straightforward. Both parties agree that the BIA's decision on January 26, 2022 was the final order of removal and that this petition for review was timely filed because it was within 30 days. It was filed on February 23rd of 2022. I understand that, but that's not answering my question, right? So you acknowledge you can't agree that we have jurisdiction, right? We do agree. But you cannot, right? The parties cannot agree to a court's jurisdiction. I understand. And so what I'm asking is help me understand not the conclusion, the dates. I understand the dates. What I'm trying to understand is why wasn't the final at the point at 30 days after the alien here chose not to appeal it to the BIA? It chose to appeal a different order, an asylum order, but it did not choose to appeal the order of removal. And so the dictionary definition section gives us two options, but one of which is 30 days after it is not expires for appeal to have occurred. Well, the IJ's order of removal did not satisfy the criteria for finality. As the Supreme Court explained in Benet versus Feer, an agency action must mark the consummation of the agency decision-making process to be final. The removal order of the IJ was subject to review by the board, and petitioners exercised a statutory right to appeal. And Your Honor referenced Nasrallah versus Barr, and that is not applicable. It addressed a separate question concerning the reviewability of withholding-only proceedings and did not alter the fundamental rule that an order of removal becomes final only after BIA review concludes. Would it make any difference that there's jurisdiction where an order granting asylum, unlike withholding, prevents removal, and so therefore you would have jurisdiction? The fact that the asylum claim is appealed, does that make any difference as to jurisdiction? No. I mean, our position is still consistent that the BIA's order was a final order of removal, and agency actions that are not tentative or interlocutory are not final. And the removal order was not- Implied in your answer-actually, I had the same question that Judge Floyd had. Implied in your answer is that appealing a denial of asylum is a defense to an order of removal. Is that what you're arguing? In other words, you're seeking review, your appeal was from the order of removal based on denial of asylum. That is correct. And because the IJ's order was appealed, that was not. Now, does that mean that that's in tension with the notion that you have separate orders for asylum and for removal? Well, it's not the separate orders. They're all the same order that should be considered in their entirety. Tell me why you think they're the same order. I mean, Najdrallah tells us they're not, and we read 1229A, and it treats the order of removal, what it calls the order of deportation, separate from relief from that. And we have tons of cases that say you can't grant relief, like CAT or asylum, unless you have already entered an order of deportation. So 1229A, you have to first enter an order of deportation. Otherwise, CAT withholding asylum is irrelevant. So it has to begin with an order of removal. And that order, Najdrallah tells us, is separate from whatever relief you're seeking. Withholding, CAT, asylum. And it may well be, as Judge Floyd suggests, that asylum is different for some reason than withholding. But it's not that they're not separate orders. We know that the order of removal is separate from any relief from that under 1229A, C-4, right? That's the relief piece. But A, 1229AA, requires first an order of removal. Well, we did have the order of removal, but again, it was appealed. So tell me why it was appealed. Because the alien here conceded removability and did not appeal it to the BIA. Because the IJ's order contained various legal errors that deserve the attention of the BIA. I'm sorry. The government's position is the IJ's order included various errors about removability? That's the government's position? If that's the government's position, why are we here? I represent the petitioners. Okay. I'm sorry. Yep. So help back me up then. So why, when you challenge the asylum ruling, does that count as a challenge to the removal order? Right? You do not challenge the removal order. You don't say I'm not removable. You don't say I shouldn't be removed, right, as an order of removal. You say I should get relief from that under 1229A, C-4, right? But those are separate orders. Well, again, because it was appealed, the issues of asylum... which is a separate order from the order of asylum. Where do I look in the record to see that you challenged the order of removal on appeal to the BIA? Well, the IJ, by denying asylum, sort of affirmed the order of removal. And the challenge before... When you say sort of affirmed, what do you mean by that? Well, by entering the denial of asylum order, the IJ or the order of removal was entered, I guess, as an effective order. But then we are saying the asylum or denying asylum contained legal errors, and that's why we appealed. But you agree you did not appeal the order of removal. There is an order of removal against your client today.  The IJ entered an order of removal. You did not challenge it to the BIA. You did not challenge it here. The order of removal. Now, you argue your client can't be removed because of asylum. But you have not argued to the IJ, to the BIA, or to us that there's not an order of removal against your client. Your Honor, the asylum denial order goes hand in hand with the order of removal. I thought the asylum order was a denial of an application. You apply for asylum, don't you? You file an application? Yes. And the IJ issued an order denying that. Yes. By denying it, the Petitioners were deprived of a relief. Denies a relief, right. But I guess your argument has to be, and it may be a complex question, but your question has to be somehow that the application for asylum is somehow a defense from removability. I mean, again, both orders go hand in hand. And just by appealing the asylum denial order does not mean that we did not appeal the order of removability. They should be considered hand in hand. All right. Do you agree that CAT relief is a defense to removability but does not challenge the order of removal? Yes, but I will not make a point on that because CAT claim is not before. I understand, but I'm asking a question, right. So if we had a CAT claim, right, do you think appealing a CAT claim would necessarily call into question the order of removal? Not necessarily. Okay. And so do you agree in that context that we'd have a jurisdictional problem? Do you think that because this is asylum it's somehow different? Is that the argument you're making? Yes. Okay. And why is it that asylum, because asylum is only entered after there's an order of removal and it doesn't destroy the order of removal, right. It just provides alternative relief, right. The order of removal remains even after asylum is granted, correct? It can't be acted upon, but the order of removal remains. I agree it can be reinstated, but still the asylum grant order is a final, meaning the order of removability cannot be enforced until after it's reinforced. It can be enforced, but it doesn't mean it doesn't exist, right. It doesn't destroy the order of removal. The order of removal remains. There's a separate order that limits the executive branch's authority to carry that out, but the order of removal remains. That's correct. Unless the panel has any additional questions about the jurisdiction. Since we have a limited time, why don't we talk about the causation. The two incidents you complain about is one where the gang came in to your, to Revis's house and sought refuge for an hour in the house. And the question is, the record seems to show they came in to hide from the police. And when the police risk was gone, they left her house. Now you're saying that they came in not to seek a hiding place from the police, but rather to persecute her because she was a woman. That's your argument. That's correct, Your Honor. Where's the factual basis for that? Well, there are ample factual basis, which the BIA disregarded, in fact. The petitioner, the lead petitioner, said that she was targeted because she was a single woman or single mother with no one implying male figure to protect her. That's in Joint Appendix 151. The gang members knew that she lived alone just with her kids, with no father or father figure in the home on Joint Appendix 153. But the fact that she, they knew she lived alone, they may have picked her house as a place to hide, but is that persecution of her? They were hiding from the police for one hour and then they left her unharmed. Well, the gang members, they were armed, and they specifically – I understand it. They were hiding from the police, though, right? But they specifically said to the petitioner that she will be killed if she does not let them in. They may have been fleeing from the police, but still she received death threats in the form – She received that threat to provide a hiding place, and she provided the hiding place without harm. Well, physical harm is not a requirement of persecution. No, it isn't, but it indicates causation. In other words, the nexus, the question is whether there's evidence that they acted in persecuting her based on the fact that she was a single woman. Well, there is also another factual evidence that the BIA disregarded, which is the gang members, when they arrived in the petitioner's home, they called her name out, meaning they intentionally came to her, even if one of the reasons they came to her was fleeing the police. And this was not considered in the BIA's consideration. And it was visible from the road, maybe, but that was cherry-picked by the BIA and IJ, because the petitioners equally testified that she was the only single woman in the neighborhood. None of her neighbors were single women, and she was known in the neighborhood to be living alone with her kids. So the nexus is pretty clear that even if the gang members were fleeing the police, they specifically thought this petitioner's home to hide and threaten to kill. No, but wouldn't that be the easier hiding place? If there was a man in the house, he might say, get out. He might have had a gun and say, get out. The gang members knew it was a woman, and they're looking for a good hiding place. The cave was deeper and darker there. Well, the petitioners argued in the brief that Salvadoran society at large values a woman less than Salvadoran men. And this means that women with men are valued more because of male presence, which in turn means women without men are valued much less. And the gangs, if they were fleeing the police, they would have been seeking somewhere they could be easily hiding, meaning where there's only women without any male presence. How about the incident involving the son, which, of course, didn't come up until after they got to the United States. She didn't even learn about it until after they got to the United States. How was that threat linked to the fact that she was a single woman? That was a classmate purportedly made a threat to her son. He actually encouraged his son to become a member of MS-13, and the son pushed back on that. But how is that linked in any way to the fact that she was a? Well, the petitioner's testimony shows that the son was targeted because, also, it was known in the neighborhood that he was without a father. And without a male protection, he was more of a vulnerable target to, you know, for the gang to recruit the son. This is a boy classmate, right? And he's at school, and he's telling the son to become a member of MS-13. And the son says no. And we don't even know if the other fellow was a gang member. It sounded to me like he was going to be a gang member, but I don't know what the threat was, number one. And number two, whether there's any evidence that that threat was made because his mother was a single mother. Well, first of all, the petitioner's son's classmate said the gang had asked him to sell drugs. And even if the classmate was part of the gang or not, he still wanted to join the gang. And he specifically said that if the son refused to join, he, meaning the classmate, and the son would both be harmed or both be killed by the gang.  Well, why don't we cover this on rebuttal? Yes, on rebuttal. Thank you. All right, Mr. Robbins. May it please the Court. My name is Jonathan Robbins, and I'm here on behalf of the United States Attorney General. A good morning to everyone. I'd like to begin by addressing the jurisdictional question that the Court asked the parties to address. My colleague is correct that the government does agree that there is jurisdiction. Now, I take Your Honor's point that we can't agree to jurisdiction. But we believe there's jurisdiction in this case for several reasons. First of all, the statute specifically provides a definition of when an order of removal becomes final that we think is applicable to this case. We also believe that the order is final under general administrative law finality principles. And then, of course, the third reason is sort of a general common sense argument. And if the Court were to interpret this case as the statute or, you know, the law as not allowing for jurisdiction in this case, it would take a wrecking ball to the judicial review scheme that we currently operate. So let's start. So why don't we start with the text maybe? I understand all these other arguments. They're sort of fun, but why don't we actually figure out what Congress has told us to do? So help me understand, I guess, Congress and the Supreme Court. Do you agree that Nasrallah teaches us that the order of removal itself is distinct from relief from the order of removal, which includes things like cat withholding and asylum? It does with respect to cat protection. It does say that in Nasrallah. But remember, let's start at the beginning with Nasrallah. The Supreme Court there found jurisdiction to review factual determinations. That case was involving a jurisdictional bar, the criminal alien bar at Section 1252A2C. And the Court, applying, among other things, a presumption of judicial review, ultimately found jurisdiction to review cat claims. So that's important to remember from Nasrallah. Well, there's jurisdiction to review both of them. There's the standard of review in reviewing them, right? Because you review the factual predicates, not just the legal predicates. But I understand Nasrallah is a different case. But what I'm trying to understand is it sets out that the order of removal is distinct from orders on relief from removal. And just accept that that's true because I think it's undeniable. I know you can fight it later if you like to. But accept for a minute that the order of removal, which is 1229AA, right, that you have to enter an order of removal, is distinct from relief from that order of removal, including a variety of things. Cat is one example, but includes other things as well. And so if that's true, accept that for a minute for me. Tell me why, you know, Martinez, when it tells us, admittedly in a different context, but it tells us that the order of removal in that case became final, quote, when the alien chooses not to contest it, why that same principle doesn't apply here? Because the IJ entered an order of removal and entered an order on asylum. The alien chose not to contest either before the IJ or appeal the order of removal to the BIA. Okay. Well, there's sort of several things to answer there.   Guzman-Chavez was dealing with a different type of removal proceeding, and it is important to distinguish. We are in what I would sort of classify as- I'm talking about Martinez, which is also the A5 proceeding. Right, right. But that's an important distinction because there- Totally understand it's a factual distinction, right? It's more than just a factual distinction. It creates a problem with the statute. Okay, so the statute 1101A47B defines and sets forth when an order becomes final. And that definition hinges on an appeal to the board. So those other contexts become very problematic because in expedited removal proceedings and in reinstatement proceedings, you don't have a right to appeal before the board. So the definition of finality becomes very difficult and complex, so complex that the Supreme Court is actually going to resolve that issue in the Riley case. I get it. Right? So we're in ordinary removal proceedings. We're not in that same type of proceeding. And that makes all the difference with respect to the statute because there can be no doubt that the statute at A47- 1101A47B applies to this scenario. We're in ordinary removal proceedings. And so that definition- But help me understand why that is, right? Because we're accepting for a minute, you can fight it later, but that Najrallah tells us the order of removal is distinct from orders on relief from removal. Not quite, Your Honor. So Your Honor's alluded to this before, but this case involves asylum. I understand that argument. And what I've asked you is to accept that premise for a minute. Okay. I understand that argument. I think it fails. We can talk about it. But I'm trying to ask the preliminary question. Okay. Right? So accept for a minute that I believe, based on Najrallah, that an order of removal is distinct from orders on relief. That they're just distinct. That is the simple line. Right? And we have here an instance where an alien appealed the relief order but chose not to challenge at the IJ or appeal to the BIA the order of removal. And so in that scenario, it is appealed, maybe permissibly, maybe not, the one but has not challenged the order of removal. And so instead of when the appeal was final, is instead 30 days after the choice not to appeal the order of removal that we have a problem. Okay. So taking your Honor's premise that they're separate orders of removal, you still have the zipper clause, which says that all questions of law in fact arising out of a removal proceeding shall be consolidated into a single issue. So tell me why that, just help me understand. You're going exactly where I wanted you to go. Help me understand why that gets us there. Like, walk me through why B-9 tells us that the appeal of one order includes all of the IJ's orders. Well, I mean, the specific language of the zipper clause says it shall be consolidated into a single petition for review. I mean, there is no mystery as to what Congress was attempting to do here. They were trying to streamline everything into one proceeding before the courts of appeals. I mean, I know of no court that has taken a view that petitions for review would have to be filed after an IJ issues a removal order, but that whole order could still change. Right? I know your Honor is taking the view that they're separate and distinct orders, but that's just simply not true. If the board overturns the denial of asylum and grants asylum, that vacates, terminates the removal order. So the notion that that form of relief doesn't affect the removal order is just not correct. Okay, so go back. I'll let you, give me the explanation of that, and then I want to turn it back over to my colleagues. So explain to me why granting asylum vacates the order of removal. Like, where am I looking to see that? I understand it prohibits, like, carrying out the order of removal, but you said it vacates the order of removal. Where am I looking for that? I can't remember exactly where that is, but I'm certain that it vacates the removal order. I don't remember the source of authority for that. But you're right about withholding and CAT. Withholding and CAT determine where an individual can be removed. Do you have suggestions? So given where I've looked, it's, like, not obvious to me that it vacates, and so I understand your certainty is helpful. You're an expert in this area. But do you have any places that I should look if I'm trying to find authority for a proposition that, let's just say, seems less than obvious to me? Again, the source of authority is escaping me, Your Honor, but I know it's the case. It's either through regulation or through board decisions, but once a grant of asylum has been granted. Presumably a regulation, like, vacate a statutorily demanded order, right? So, like, if your answer is what I thought you might say, if your answer is, oh, the regulations tell us that, maybe guess again. Do you have anywhere that's, like, not the agency telling us what's happening? If the Court will permit, I'll supplement after argument in 28J the authority that we believe says that the asylum terminates the order of removal. But that is the way I've always understood it. Okay. That would be helpful.  What it is about granting asylum that vacates an order of removal. Okay. That would be helpful. Now, again, this would create, if the Court were to determine that the statute, which specifically defines the order of removal as becoming final. So even if you think they're separate and distinct orders, that order of removal, which is the term used in the statute, still becomes final under the exact language of the statute when the Board affirms the immigration judge's order. Or when 30 days has passed, if you choose not to. And so here the alien, in one view, I'm not even saying it's my view, but in one view, the alien had a choice to appeal the order of removal and did not. And so this is the second instance, right, where the 30 days kicks in rather than waiting on the Board to act. So I'm, we're both looking at the same statute. I think you just are assuming that only one provision can apply. But that comes back, I think, let me, is there anything other than the zipper clause that lets you think that the appeal of one order necessarily involves the appeal of both orders? Well, I would say that I understand Your Honor's position looking at Nasrallah and Guzman-Chavez in context. But there has been case law by this Court subsequent to those decisions, for example, in the Salgado case, that would seem to establish precedent contrary to that position. So Salgado was a road map. Not really. They're just drive-by, right? They're not addressing the question here. It doesn't seem like to me, right? Well, Salgado was a case where the non-citizen also conceded removability. And the removal order became final on the date that the Board upheld the immigration judge's decision denying requests for relief and removal. And the only remand was for voluntary departure. There's no doubt that this issue, which has not been raised before, has not been addressed before. I totally acknowledge that, right, that the courts that have passed by this have not addressed it, right? But that doesn't help us, right? Drive-by jurisdictional rulings, like, don't get us very far. I totally take your point. The Supreme Court's done it. We've done it repeatedly. I acknowledge it. Like, I've been on panels that have done it, right? I totally understand that. But that doesn't answer the jurisdictional problem, right? It doesn't. But, again, this would be taking a wrecking ball to our judicial review scheme. It would be so contrary to what Congress was attempting to do. I mean, I think it's very unlikely that the Supreme Court in Nasrallah and Guzman-Chavez, without saying so, said that, okay, we're going to bypass the statutory requirement that individuals exhaust their administrative remedies. We're going to bypass the zipper clause, and we're going to now require everybody to file petitions for review after an IJ's decision when it's not even clear that they'll need a petition for review at that point. I'm not fighting that that wouldn't make a lot of sense. I'm just asking whether, like, that's what the statute does. They're different questions, right? I'm not a czar designing what I think would be a good system, right? I'm trying to understand what the system is. Right. But my point is you're interpreting this based on what the Supreme Court said in Nasrallah and Guzman-Chavez. And I find it very unlikely that every time the Supreme Court has been faced with a similar situation where they would interpret a statute that would make everything totally no longer make sense, they've refused to do it. They just did it as recently as Santos-Zachariah in the exhaustion context. They did it in famous cases like the Obamacare case where they said we're not going to interpret a statute that makes everything collapse upon itself. So the notion that the Supreme Court is espousing in Nasrallah and Guzman-Chavez that we're all of a sudden ignoring 30 years of jurisprudence on how petitions are reviewed or filed, doing this completely contrary to what we know that Congress intended, respectfully, Honor, I think that's something of a stretch. I know that the Court can't agree to jurisdiction, but I think the Court would be putting itself out on a very lonely limb to find that petitions for review now have to be filed en masse after an immigration judge's order. That seems to me to be not a very plausible view of what the Supreme Court is doing. I take your Honor's point that there is some confusion. And that was actually a point. If you listen to a recent Supreme Court case in Bo'arfa, which was another immigration case, Justice Kavanaugh in that case alluded to Nasrallah, and I don't remember exactly what he said, but he said, I may have caused some confusion with that case. So I think reading Nasrallah in a way that totally wrecks our judicial review scheme is something we would implore the Court not to do that here. And so, you know, that's sort of the last argument, the common sense argument. I understand that one. I think this can begin and end with a statutory language in 1101A47B. That specifically sets forth when an order becomes final. So even if you think that original order is separate and distinct, that order becomes final when the person either appeals to the board and, again, we're dealing with the same order. Those two may be distinct, but it's the same order in terms of that. Might be the same decision, but it's, I think, not the same order. Well. I mean, I think 1229A sets up a system where we have an order of removal that is distinct from an order on relief from that removal. Right. But that's where this is distinct from those other streamlined proceedings. So streamlined proceedings, it's true there's an order of removal. For example, an order of removal. It's actually very much like the civil area where we have a judgment. The judgment is appealed and includes any order that was, even though the judgment doesn't address a particular order, any order that was preceded it in the litigation is appealable and reviewed. But I gather that's somewhat analogous to what you're arguing. Yes. I mean, again, the statute says an order shall become final and hinges it on the board.  And so those other, Guzman-Chavez, which deals with a situation where you don't have an appeal for the board, in those proceedings you have what's called withholding only proceedings. That can happen months after the order is done. That's not the case in ordinary removal proceedings where everything is done in the same process. And, again, there is no mystery about what Congress was trying to do here. They wanted it to be done the way it's been done for the last 30 years, and I think it's very, well, I mean, you can never predict the future, but I think it's very unlikely the Supreme Court is going to espouse a scheme that creates total chaos in the judicial review area. I just don't think that's very plausible. I see I have a little time left. Unless the Court has any further questions about jurisdiction, why don't I address the merits very briefly. As we've argued in our brief, there have been dispositive issues that have been waived. But even if those issues weren't waived, the record here amply supports the agency's conclusions regarding nexus, cognizability of social group, past persecution. Your Honors have already alluded to it in the opening presentation with my colleague, but this is a very easy case to determine that the record supports the agency's conclusion regarding nexus. The petitioners were the unfortunate victims of opportunistic criminals. They were fleeing from the police. They needed a place to hide. Their home was, I guess, in the wrong place at the wrong time, so to speak. But there's no indication that the gang members in that situation were in any way motivated due to the petitioner's status as a single female or any family status. So the record there amply supports the agency's nexus conclusion, and nexus is dispositive of both asylum and withholding removal. Petitioners are not challenging CAD. They didn't exhaust that before the board. So that's the easiest way to resolve the merits of the case. With respect to the cognizability of social group, the agency, I think, correctly determined that single Salvadoran females isn't a cognizable group. The term single is amorphous. It's not clear what it means. Does it mean not married? Does it mean somebody without a boyfriend? If you don't know who's in the group, it's not a particular social group, and so it fails on that grounds. The agency also pointed out that the group wasn't socially distinct. There's no indication that Guatemalan society views single females as a separate faction of society in any meaningful way. Was there a finding by the IJ that the home invasion incident was past persecution? Was there a finding to that effect? There was a finding that what happened to them in the home rose to the level of persecution. But in order to constitute persecution for refugee status, it has to be on account of a statutorily protected ground. But the IJ did say that the harm that they suffered in the home having being forced at gunpoint to sort of – Well, would that finding be sufficient to trigger the rebuttable presumption of future persecution? Not without a tie to a protected ground. And so the presumption is only met if the harm rises to the level of persecution and the harm is tied to a statutorily protected ground. So there's no presumption without that tie to it. Let's see if we can agree on something else. If our precedent says death threats or persecution, then didn't Axel suffer persecution because he received death threats from a classmate? Not quite, Your Honor. So what this Court's precedent says is that a death threat can constitute persecution. But what the agency has a responsibility to do is to try to determine, is this some sort of systematic type of persecution or is this just simply an isolated incident? And I think the agency did a pretty good job here explaining why they thought that this threat wasn't sufficient, even though a threat can be persecution, why it wasn't in this case. The agency talked about the fact that the petitioner – the threats lack credibility and immediacy and specificity. Again, as Your Honor already alluded to, the lead petitioner in this case didn't even know there was a threat after she was in the United States. Well, why wouldn't the answer to my last question be yes from both sides? I'm not sure what you're asking. My question was if our precedent says death threats or persecution, then didn't Axel suffer persecution because he received death threats from a classmate? Respectfully, Your Honor, the precedent doesn't say that death threats are persecution. It says that a death threat can be persecution. So this persecution is defined on a case-by-case basis. The agency has to look in every single case to determine what the particular acts were in the case and whether it's harm rising to the level of persecution. There are some cases where threats are so immediate or so specific or combined with other things that makes them so threatening that they can constitute persecution. But that's an assessment that has to be made on a case-by-case basis. So the precedent doesn't say that a death threat is automatically persecution. It couldn't say that. The Board has a responsibility to determine persecution on a case-by-case basis. So the Board here acknowledged that precedent that says that a death threat can be persecution. It specifically cited that precedent in its decision. But then it explained why this particular threat wasn't sufficient to meet the high threshold that needs to be met in order for harm to be defined as persecution. I see that I'm in the red. If Your Honors have any more questions, I'm happy to answer them. Thank you. Thank you very much for your time, Your Honors. Ms. Kim. To reply to the government's argument, no arguments had been waived by petitioners. They were fairly presented in the opening brief. Respondent had noticed all the petitioners' arguments and had an opportunity to respond. And simply, they have not waived any arguments whatsoever. And they were pretty much the same issues raised before the Board of Immigration Appeals. And this case is clear that petitioners received death threats on two occasions, March 2015 and September 2015. They both rise to the level of persecution. And in fact, both the BIA does not deny that the September 2015 constituted past persecution. And also, March 2015 also is past persecution because this Court has long and repeatedly held that a death threat qualifies as persecution. There are just too many cases to cite here. And they were both. Is your argument that any time you receive a death threat, that is persecution for purposes of asylum? Well, yes. Always. Any time. I agree with my colleague that the Court sort of has to consider the circumstances. But in these two incidents specifically, they do comprise a past persecution because they were concrete death threats. And these were on account of a protected ground. The petitioner was part of the family of her son and also part of the single Salvadoran woman. And these are both cognizable groups. There's no dispute family is a cognizable group before this Court's precedent. And single Salvadoran females is also a cognizable group. And in fact, in the consideration of this ---- Have we ever held that Guatemalan women or Salvadoran women or whatever is a particular social group? Well, the issue is single Salvadoran women. And I believe the Court has not made an explicit finding on this. But we argue that it is a cognizable group. We have an unpublished opinion, don't we, on that? Yes. But unpublished ---- I understand. We don't rely on it for precedent. But we have looked at it. That's correct. And also because in the consideration of this PSG cognizability, the BIA did not give any consideration to the fact that she testified that she was part of the single Salvadoran females. And the Board did not find whether this petitioner falls under this group. And because our argument is that she does and the fact that she was persecuted as part of this group shows that this group is socially distinct. And also the Board disregarded the fact ---- Well, that's a little circular. We've rejected that. The fact that she was pursued doesn't make her part of that group. The group has to preexist the conduct and has to be the motivator for the conduct, the persecution. Right? Yes. But then still the Board failed to consider the petitioner's testimony and her friend's testimony, saying that she was targeted because she was a single woman without a husband. There is nowhere in the Board's decision where the Board gave consideration to this factual evidence. And the petitioner consistently testified that the kids don't have a father or a father figure. And this is being perceived as unprotected. And also the petitioner's brief before the BIA also provided that petitioner's domestic status is a characteristic that petitioners should not be required to change. This also goes to the cognizability of this group. Thank you. Thank you. We'll come down in Greek Council and then proceed on to the next case. After we come down in Greek Council, I'd ask you to approach the bench and Greek Judge Floyd too.
judges: Paul V. Niemeyer, Julius N. Richardson, Henry F. Floyd